## THONNESEN et al. v. MONTGOMERY WARD & CO.

District Court, E. D. New York.
July 17, 1939.

Alexander Deutsch, of New York City, and Anthony E. Maglio, of Brooklyn, N. Y., for plaintiffs.

S. M. & D. E. Meeker, of Brooklyn, N. Y., and White & Case, of New York City (Lowell, Wadmond and Chester Bordeau, both of New York City, of counsel), for defendant.

INCH, District Judge.

This is a motion to dismiss the complaint made at the close of plaintiff's case and renewed at the close of the trial.

Decision was reserved until a verdict, if any, of the jury.

The jury disagreed and were duly discharged. Thereupon the court after exchange of briefs heard the motion.

While there are several plaintiffs, and several identical motions, I shall hereafter refer to all as one motion.

Defendant moved to dismiss on the ground that the plaintiff had failed to make out a cause of negligence on the part of defendant in the manufacture and sale of a kerosene oil burning heater, had failed to prove any inherent defect in the stove, and had failed to make out any cause of negligence in the servicing of the burner.

This court reserved decision, as above stated, because it felt, during the trial, that there might be substantial merit in such a motion, but desired first to have, if possible, a verdict from the jury, and thereafter ample time for a careful consideration by counsel, as well as the court, of such an important step in the case.

This is the third trial of these suits. The first trial occurred in January, 1938, before Judge Abruzzo and a jury. It consumed a number of days and in spite of a careful charge by the judge, the jury disagreed, were discharged and the action replaced on the trial calendar of the court. The second trial came on to be tried in February, 1938, before Judge Campbell and a jury. Again a long trial took place and once more the jury was charged with a most careful charge, but the jury disagreed and were duly discharged. On May 19, 1939, the action again appeared for trial, this time by different trial counsel and apparently with a different expert for plaintiff. This trial consumed a number of days with the result however that again the jury disagreed, were duly discharged. If this motion is not sound the case will again have to be tried.

On three occasions therefore, with able counsel for plaintiff conducting each of the trials and with various theories presented by various experts for plaintiff, no verdict for plaintiff has been secured.

Counsel for plaintiff correctly states that on such a motion as this, plaintiff is entitled to the most favorable inferences deducible from the evidence and all disputed facts are to be treated as established in their favor. It is only where, as a matter of law, there was no evidence sufficient to submit to the jury that this court can thus terminate the actions instead of again placing the issues on the trial calendar for another trial.

The undisputed facts are that on or about October 18, 1936, pursuant to an advertisement in a daily newspaper, Mrs. Walter Thonnesen purchased two cabinet oil heater stoves at the Jamaica store of the defendant. They were duly delivered and one was placed in the upstairs apartment of Walter and Helen, his wife, and the other in the downstairs apartment of his mother, Inga Thonnesen, and her daughter Ida. The house was located at 117 Gain Court, Gerritsen Beach, N. Y. It was formerly a one-family house, wooden bungalow type. There was no cellar. The only means of heating same was the kitchen coal stove and these two cabinet kerosene oil heaters located as

above. When Walter had married the upper floor was made into an apartment for himself, his wife and baby, while his mother and sister continued to live in the lower floor. The house belonged to Mrs. Inga Thonnesen.

We are not concerned with the cabinet oil heater in Walter's apartment as plaintiff's proof shows that this stove "was all right" according to the testimony of both Ida and Walter. When the service man from defendant, Montgomery Ward & Company, subsequently appeared, as will be referred to later, he was told it was not necessary to go upstairs to see it.

About a month after the stoves had been installed and on or about November 22, 1936, Walter's wife wrote the defendant requesting that a service man be sent as they had been having trouble with the "stoves", that "they" had not worked right. Accordingly, about a week later, a service man, Mr. Kramer, was sent to the house, received by the mother, and informed that the stove upstairs had ceased to cause any trouble, but that the stove in the living room downstairs was not functioning properly. Mr. Kramer thereupon inspected the stove in question and I shall hereafter refer, by necessity in detail, to his testimony, as it is on what he did that counsel for plaintiff now rests his case.

On the argument of the motion counsel for plaintiff stated that they no longer relied on the allegations that the stove was inherently defective and dangerous as sold by defendant, but continued to claim that the defendant through Kramer negligently made repairs to the stove and as a direct result of this negligence of Kramer the disaster occurred.

The following extracts from plaintiff's briefs confirm this position:

"The accident was caused solely by the defective repairs, by the defendant's agent, to the stove in issue. These repairs caused the fire which in turn caused the damage sustained by the plaintiffs". (Page 15, Plaintiffs' Brief).

"Plaintiffs' theory for the cause of the fire is that the repairs made by the defendant's agent were negligently and improperly made". (Plaintiff's Reply Brief, Page 1).

"Defendant's improper repair was the cause and the proximate cause of the injury". (Plaintiff's Reply Brief, Page 25).

As a matter of law no adequate proof was offered by plaintiff that there was a specific defect in the stove when sold and delivered which ordinary care on the part of defendant would have discovered. The defendant did not manufacture the stove but was merely the vendor thereof, it was one of thousands manufactured by the United Stove Company of Ypsilanti, Michigan, and it was known as the Sunshine Heater. It was intended, as advertised, to burn common kerosene oil. It was a compact heater of attractive appearance suitable for a living room, having two burners with metal chimneys and a small tank on its back which contained the kerosene which operated to feed the burners by gravity.

I shall assume for the purpose of this motion only that the stove offered at the trial by plaintiff was the stove in question. This being so there is no evidence that the stove exploded, for its appearance was entirely inconsistent with any such theory. The loud noise, therefore, testified to by several witnesses cannot be traced to any such cause.

Considering therefore the real cause of complaint now made by plaintiff which relates to alleged negligence of Kramer, the service man, it appears that this stove was used off and on, after his visit, during the following month of December, with its occasional cold days. There is testimony that it smelt of kerosene, that it caused some soot, but so far as plaintiff's proof goes, it continued to be used without the slightest evidence of any such danger as is now claimed.

On December 22, 1936, a month after Kramer's visit, the stove was placed "cater-corner" in a corner of the living room, near a window, on which lace curtains hung down to the sill, and a short distance from the wooden paneled wall of the room, there being room to walk around it if necessary. That afternoon Walter lit the stove about three or four o'clock and went upstairs again to go to sleep as he worked at night. He did not put the stove out. Later that evening his sister Ida, a young woman of sixteen, came home about six or six-thirty and after supper and about eight-thirty she asked permission of her mother to light the stove. Both she and Walter had on other occasions done this. She found the stove out.

Whether it was out because the supply of kerosene in the tank had gone down so

low that the gravity pull would not operate or for some other reason does not appear.

Nevertheless, it was out and there is no dispute about this fact.

When it went out does not appear and whether the tank was refueled by Ida before she attempted to light it again or by her mother is left undetermined. Ida testified she may have done so, but, in any event, for the purpose of this motion only, I shall assume that common kerosene was used.

The defendant did offer proof from which an inference might be drawn, that gasoline was used by mistake and thus the fire that resulted accounted for, but this would be a question of fact for the jury with which I am not concerned. I shall assume therefore that common kerosene was used in the stove at the time it was lit or if it was refilled, that that fuel was used.

Ida testified, "I turned the handles down to 'Light', took the chimney off, let it stay there for a few minutes, lit a match put it to the wick, put the chimney back on and turned the handle to the right to the position 'Burn', I then went back to the kitchen".

In a few minutes Ida and her mother in the kitchen heard a cry of alarm from Helen upstairs and on entering the living room saw flame coming from the stove. Thereafter the woodwork in the wall back of the stove caught fire as well as the curtain at the window. Walter came down and attempted to turn off the stove, but the fire had progressed to such an extent that the lights went out and by the time the Fire Department had arrived, all of which took place within approximately one-half hour, the bungalow was destroyed, Walter and his infant son were slightly burned, Helen, overcome in the darkness by the smoke and fire, perished. Ida saved the baby by throwing it out the window in a blanket and she herself was injured in the jump afterward.

■ It can be easily seen that the natural sympathy of a jury would be aroused by such a catastrophe. Whether or not there was contributory negligence on the part of plaintiffs in placing the stove where it was or in failing to follow the directions accompanying it or in the use of some other fuel such as gasoline, I feel would be questions of fact for the jury. I am therefore assuming, for the purpose of this motion only, that there was no contributory negligence.

The fire occurred December 22, 1936. In January a lawyer was consulted and this attorney commenced suit against the defendant in May, 1937. The history of the litigation since that time has already been set forth.

It would not be sufficient for plaintiffs to merely prove there was a fire in the oil heater. This is a case where something more must be shown. Plaintiffs must show some evidence by which negligence on the part of the defendant arises in connection with the fire. This they claim has been done by showing that a service man came and inspected the stove and that a month after, although it had been used on several occasions since Kramer's alleged negligent acts, culminated in a fire which communicated itself to the wall and the curtains and destroyed the house and property within it with the personal injuries and loss of life mentioned.

■ While it is not sufficient, as I have said, for plaintiffs to simply prove that a fire occurred in the stove, there was, in view of the proof of the circumstances, a requirement on the part of the defendant to put Kramer on the stand so that he could be cross-examined as to what he actually did. This being done, while plaintiffs are not bound by the testimony of Kramer, nevertheless, the defendant has done all that it would be required to do and the burden continued to remain upon plaintiffs to prove by some evidence that Kramer was negligent.

Kramer testified, on direct examination, as follows:

"That he was thirty-two years old, that he had been with the defendant six years at its Jamaica store servicing oil burners, washing machines and refrigerators. That about five-thirty in the afternoon of November 29, 1936, he went to the Thonnesen home and was let in by Mrs. Thonnesen Sr. He told her that he was the Montgomery Ward service man and she took him to the living room and showed him the oil heater there which she said was not burning right.

"I started to look the stove over. I saw that it wasn't level. I opened the front door and looked in the oil heater, took the hoods off and noticed that the wicks were very high. They had a gummy substance over the wicks. I then opened my tool

kit, went around the back of the stove and took off the oil tank and put it on the floor. I noticed that the oil in the reservoir pan was a dark brown color, that there was sand in it and it was quite dirty. I asked Mrs. Thonnesen to give me a pan and she gave me one. I then took two pieces of wire from my tool kit and put wire through this little hole in the oil ring after taking the two wicks out of the burners to see if there was any sand or grit clogging the reservoir up. I did that to each burner. I then unscrewed one of these caps at the end of the main and let part of the water out in order to clear it, then I tightened it and opened the other cap on the other side of the heater and let the balance of the oil wash through and tightened that nut and went back of the oil heater and cleared the back of the reservoir or the bottom of the reservoir pan. I then noticed that there was a small amount of sweating on the packing nut here, that the bottom of the drip pan was slightly wet or damp from a small amount of kerosene. I tightened the packing nut, I then put the tank back, leveled it out and asked Mrs. Thonnesen what kind of oil she was using. She said ordinary oil. I asked her if I could see the kerosene, so she went out and brought back a large round crank case oil drum—kerosene was in that drum, it was dirty, a very dark brown color. I told her that she should get a pure kerosene oil in order to burn in this stove. Then I regulated the burners to burn to the Light position and started the heater up. I then left it for a few minutes and then turned it to the Burn position and I waited about 15 or 20 minutes until I saw that it was burning a blue flame and then I went out."

On cross-examination, Kramer testified as follows: "There really wasn't anything wrong with the stove other than the stove wasn't level and the dirty kerosene, not pure kerosene, which would gum up the wicks. It was kerosene dark brown color. The oil on the back of the tank was dark brown and the bottom of the reservoir tank was filled with sand—you could see it. It was not gummy it was like a thick substance, it was sort of a slime floating in the oil. All I did was to clean the stove and level it. The mains had corks at the ends and was sealed by a cap. These corks are at the end of the main that feeds the burner head. The kerosene would not leak out even if the cork was not there. The cork was simply an extra piece for it itself does not prevent leaks. The cap screwed on tight prevents it. I found the handles such as an ordinary pressure would move them up and down. I tightened the nuts some. If it is loose the handle would work loose, but you would have to tighten it very much so that you could not move it. If the packing nut was all the way out the burner would drop. That is the only time it could drop. The chimney weighs about three pounds. You get a yellow flame when you turn the handle down to Light. This is so because you are then getting more oil in the burner and with a larger flame you are getting a greater heat. It burned a blue flame in the ordinary operation—a nice clean blue flame with the same fuel that these people had been using. If you use clean kerosene the wick would remain white, but the top would be black. Pure white kerosene is the same as common kerosene as long as it is clean. Common kerosene is what was intended. When I put the wicks back they were as clear from carbon as I could get them. The top edges were soft, the wick itself pliable".

From the above examination and cross-examination of Kramer the conclusion reached by counsel for defendant is approximately correct. "All Mr. Kramer did was to clean the stove which he found was in a dirty condition caused by using a poor grade of kerosene. He found the burner handles in normal shape, tightened the packing nuts slightly, lighted it and waited about fifteen or twenty minutes while the heater burned properly and then left".

It is uncontradicted that from about 5:30 P. M. when Kramer left that day, until about 10 o'clock that night, when Mrs. Thonnesen went to bed, the heater burned without anything happening and from time to time during the following month the heater was used without causing any unusual flame else surely some witness for plaintiff would have remembered and testified to such occurrence, yet the testimony is silent in this regard.

Accompanying the stove were specific directions by the defendant as to the use of the stove. These were offered in evidence by plaintiffs. In substance they directed that the stove be kept level and away from a wall. A small wrench came attached to the stove and reasonable notice was given in the tag, likewise attached, that from time to time, due to use, the packing nut might become somewhat loose and should be tightened by the use of this wrench, yet,

there is no evidence that anyone ever used this wrench. Such neglect, if any there was, cannot be charged against Kramer after he left.

Kramer made no repair of the stove nor indicated any such thing was necessary. His advice was limited to keeping the stove level and clean and the use of a better grade of kerosene.

So far, therefore, as a matter of law, there is no evidence of carelessness on the part of Kramer.

In their bill of particulars, plaintiffs stated that they did not know exactly what caused the fire except that the stove was not operating properly.

It is claimed that several theories, by as many experts, have been advanced and abandoned by plaintiffs during the several trials. The theory now advanced by expert Dingwall is the only one in which we are interested.

Expert opinions are oftentimes valuable in making plain, results that ordinary laymen would not suspect would occur, but experts must base their opinion on facts proved or assumed to be proved at the trial. Plaintiffs seek to show Kramer's alleged negligence by expert opinion.

This alleged negligence of Kramer is based, for the purpose of the expert's opinion, on the alleged fact that the "burner heads" dropped from the "Burn position" to the "Light position" after Ida lit the stove and left it that evening of December 22, 1936. This alleged fact is assumed to have been proven at the trial.

Counsel for plaintiffs dwells on this unproven fact definitely in his briefs as follows: "Walter attempted to put the fire out by turning the handles to the "Out position". He saw that they were over towards the "Light position". The weather report showed the temperature, between eight and nine o'clock, was 24 degrees above zero. The burner head dropped either because the packing nut was too loose or because an insufficient quantity of packing in the packing nut, or a combination of these two. This was negligent and improper repair. Approximate cause of the fire was the dropping of the burner heads". (Plaintiff's. Reply Brief, page 16).

■ If a choice of opinions between witnesses for plaintiffs and defendant is presented to the jury, each based on facts proved at the trial, this court could not substitute its choice. The court can, however, search the testimony for evidence of the facts on which any opinion is based. That is the sole purpose here.

Accordingly, we must consider what testimony there is as to any "dropping" of the burner heads the day of the fire which is said by the expert to have first caused the flame to come from the stove, due to what he terms "a critical condition" of the stove, and allowed the board wall and curtains to catch on fire which combined heat then affected the kerosene feeder system of the stove.

We start that afternoon of December 22, 1936, when Walter lit the stove. Apparently he saw nothing wrong, for he left it lit and went upstairs where he was subsequently joined by his wife Helen. How long the stove burned does not appear, but when Ida wanted to light it about 8:30 that night the stove was out. So far there was nothing unusual about the stove. Ida testified that she had to turn the handle down to the "Light position" and spent several minutes relighting the stove. It is apparent therefore that the handle had not dropped down from the position "Burn" to "Light" else Ida would have found it at the "Light" position.

Walter testified that when he lit the stove that afternoon he likewise turned the burner down to the "Light" position, that "it had not fallen down before I came down to light it that afternoon". So that the only two witnesses that lit the stove that day both stated that the burner had not dropped down from the "Burn" position to the "Light" position. This is direct evidence by the plaintiffs' own witnesses.

Moreover, when Walter again came down to put out the fire and attempted to turn the handles to the "Out" position, he testified that the handles were towards "the Light position" not "at" such position which is not without its significance. There is therefore no evidence whatever that the burners had dropped to the "Light" position before the fire.

Mrs. Thonnesen, Sr., testified, that before Kramer came the handles were kind of hard to operate, that after he had gone they were very easy to operate. That she didn't see any dirt in the kerosene or sand. That they used the stove several times after Mr. Kramer had been there and that on the occasion that Kramer came and lit the stove it was about five or six o'clock at night and that it was burning until she

went to bed about ten o'clock. That the next morning it was out.

It appears therefore, without contradiction, that for almost a month after Kramer had cleaned the stove that nothing extraordinary or unusual happened when the stove was used.

Thus, as a matter of law, there was no proof here sufficient to go to the jury which indicated directly or by fair inference that Kramer had been careless in doing something to the stove. However, plaintiffs claim that making the handles easier to operate may "possibly" have caused the burner to drop down from the "Burn position" to "Light position", but any such theory, as we have seen, is directly contrary to the testimony of Walter and Ida each of whom had lit the stove on the day in question, the latter but a few minutes before the fire.

In view of the direct testimony referred to it is mere speculation to consider general statements that in the months preceding the fire the burners occasionally dropped. There is nothing to warrant such fact or inference.

Moreover, the stove was intended to burn at the "Light position". This was not a defect. Plaintiffs' expert testified, that he didn't believe you would have any fire if you let the stove burn at the "Light position" all the time and that if the stove was allowed to burn at the "Light position" it was not a defect.

It appears clearly that the stove was designed to burn at the "Light position" if necessary, but that would require the maximum flow of kerosene and besides would not be desirable. Thus the dropping of the burner would not cause the fire.

Without any facts proven or assumed properly to have been proven that the burners had dropped to "Light position" plaintiffs' expert started with such alleged fact as a basis for his theory. He then contended for what he termed "a critical condition". This condition he could not clearly define, nor when it would occur, but said it would depend entirely upon the temperature of the chimney and the burner head. He admitted that the heat generated from the burners themselves would not be enough to increase the flow of kerosene into the burner. However, if in some way, according to the expert, a "critical condition" existed in the stove and you obtained any addition to the ordinary heat in the stove, this additional heat from the outside such as from the burning of the wood wall behind the stove, the curtains, etc., would to a large extent, increase the flame by encouraging a larger flow of oil than the burners could control. Certainly defendants are not to be blamed if the stove was kept by plaintiffs too near the wooden wall. It could be placed anywhere in the room.

I see no necessity to go more in detail into the theory thus presented, for the first time apparently, where there are no facts or fair inferences therefrom upon which such a theory can be based. A jury cannot guess or speculate on the liability of this defendant, because of alleged negligence of Kramer when it is based solely on such an indefinite opinion which, in turn, is not based on proven facts.

A jury cannot speculate as to the cause of the injury. Reiss et al. v. New York Steam Company, 128 N.Y. 103, 28 N.E. 24; Pickens v. Crowley-Milner & Co., 258 Mich. 102, 241 N.W. 838; Pennsylvania R. Co. v. Nelson, 2 Cir., 259 F. 156; Ruback v. McCleary, etc., 220 N.Y. 188, 115 N.E. 449; Laidlaw v. Sage, 158 N.Y. 73, 52 N.E. 679, 44 L.R.A. 216.

I have carefully read the testimony presented by the plaintiffs and have come to the conclusion that the liability of the defendant here alleged by plaintiffs is shown to depend not on any facts or fair inferences of facts indicating negligence, but on an opinion of an expert not supported by any of the proven facts and contrary thereto, making such alleged liability for negligence depend upon a mere guess or speculation. This being so it is more easy to understand why natural sympathy of some members of a jury, considering such a tragedy, would be opposed to any question of testimony or lack of it and this possibly accounts for the three disagreements.

Of course, I have not considered, in any way, the testimony of the defendant's witnesses (except that of Kramer), nor have I considered the opposing theory of the expert produced by defendant. Such matters would be for the jury under a proper charge as to their duty to consider all the evidence and the various theories and opinions based on the facts found proven by them in the case.

As a matter of law, plaintiffs have failed to prove any negligence on the part of the defendant in the sale of the heater, have failed to prove any inherent defect

in the stove, and have failed to make out any cause of negligence in the servicing of the burner by Kramer. This being so it is the duty of the court to grant the motion to dismiss.

The motion is accordingly granted, with costs of this trial.